**MY RIGHTS LAWYERS, LLC**
The Douglass Law Group
Michelle J. Douglass, Esq.
Attorney Id. No. 025091988
424 Bethel Road
Somers Point, NJ 08244
T: 6097883595 | F: 6097883599
mjd@myrightslawyers.com
Attorneys for Plaintiff, Maria Mattera

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARIA G. MATTERA,<br><br>                                      Plaintiff,<br><br>           v.<br><br>CITY OF NORTH WILDWOOD, UNITED PUBLIC SERVICE EMPLOYEES UNION, & GARY SLOAN, individually and in his official capacity<br><br>                                      Defendants. | Civil Action<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff, Maria G. Mattera, employed and residing in Cape May County, New Jersey, says by way of Complaint against the Defendants as follows:

### INTRODUCTION

This Complaint, brought by Maria G. Mattera, alleges claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. for sex discrimination and harassment;  under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. for retaliation; under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. for disability discrimination; under the Family Medical Leave Act, ("FMLA"), 29 U.S.C.A. § 2601

et seq. for retaliation; for violations of the New Jersey Family Leave Act ("NJFLA"), N.J.S.A. 34:11B-1 et seq.; for breach of the duty of fair representation under the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 141 et seq.; and for violations of the New Jersey Civil Rights Act ("NJCRA"), 10:6-2 et. seq.

## THE PARTIES, WITNESSES AND OVERVIEW

1. Plaintiff, Maria G. Mattera, ("Plaintiff" and/or "Mattera") is an employee of the Department of Public Works of the City of North Wildwood, and a member of the United Public Service Employees Union.

2. Defendant, City of North Wildwood ("City of North Wildwood" and/or "Wildwood"), is a city located in Cape May County, governed under the City form of municipal government, offices located at 901 Atlantic Avenue, North Wildwood, NJ 08260.

3. The City of North Wildwood is a public body subject to suit under the New Jersey Law Against Discrimination, and is the employer of Plaintiff, subject to suit, within the meaning of N.J.S.A. 10:5-5 of the New Jersey Law Against Discrimination, N.J.S.A. 34:11B-3 of the New Jersey Family Leave Act, and 29 U.S.C.A. § 2611 of the Family Medical Leave Act.

4. The City of North Wildwood is a civil service agency.

5. The Department of Public Works ("Public Works") is a department within the City of North Wildwood that handles, among other tasks, the maintenance of streets, city properties, sewers, storm water systems, beaches, the vehicle fleet, the convenience center, and parking meters and kiosks.

6.  The United Public Service Employees Union ("UPSEU" or "Union") is a union representing over 28,000 public sector employees including the workers at the City of North Wildwood's Department of Public Works, and the Plaintiff, and is a labor organization within the meaning of 29 U.S.C. § 152 and 9 U.S.C. § 142.

7.  UPSEU and the City of North Wildwood were bound by a collective bargaining agreement ("CBA") during all times relevant to this Complaint.  This collective bargaining agreement is incorporated herein by this reference, and attached as **Exhibit A** to this Complaint.

8.  Gary Sloan ("Sloan") is a former North Wildwood Chief of Police and, at all times relevant, was the Public Works Director, and was also appointed as confidential aide to Mayor Patrick Rosenello.  At times relevant, Sloan was the supervisor of Mattera.  In or about March 2015, Sloan was hired and he became the Public Works Director in or about May 2015.

9.  When Mattera was hired, Harry Wozunk ("Wozunk") was the Superintendent of Public Works, who did precede Sloan in supervising Plaintiff.

10. At times relevant to the Complaint, Tim Chester ("Chester") and Carl Delinski ("Delinski") were supervisors who supervised employees at Public Works, such as Plaintiff, and reported to Sloan.

11. Kevin Yecco ("Yecco") was, at all times relevant to the Complaint, the Business Administrator for the City of North Wildwood. At all times relevant, Yecco was a supervisor of Mattera.  Among other duties, Yecco was charged with receiving,

processing, and making decisions on the complaints filed by Mattera and other employees of Public Works.

12.  Dillon Mole ("Mole") was, at all times relevant to the Complaint, an employee of the City of North Wildwood.

13. John McCann ("McCann") was, at all times relevant to the Complaint, an employee of the City of North Wildwood.

14. Rose Halliday ("Halliday") was, at all times relevant to the Complaint,  an employee of the City of North Wildwood, and the Union shop steward.  As shop steward, Halliday was a labor union official who was tasked with representing and defending the interests of her fellow employees.  Halliday was designated to act with authority on behalf of the Union.

15. Brian Onuskanych ("Onuskanych") was, at times relevant to the Complaint,  an employee of the City of North Wildwood, and the Union alternate shop steward. As alternate shop steward, Onuskanych was a labor union official who was tasked with representing and defending the interests of her fellow employees. Halliday was designated to act with authority on behalf of the Union.

16. The actions of Sloan, Yecco, Mole and the other employees of the City of North Wildwood relating to and concerning the terms and conditions of Plaintiff's employment, were conducted in the course and scope of their employment, and Wildwood did have knowledge of the acts of discrimination alleged herein.

17. At all relevant times, Sloan was acting under the color of state law as an acting policy maker, for the City of North Wildwood.

4

18. The actions of Halliday, Onuskanych, and the other members of the Union relating to and concerning the terms and conditions of Plaintiff's employment and her concerted activity, were conducted in the course and scope of their work for the Union with actual and/or apparent authority to act on behalf of the Union.

## JURISDICTION AND VENUE

19.  This Court has subject matter jurisdiction over Plaintiff's claims under 29 U.S.C. §2617, 29 U.S.C. §185, 29 U.S.C. §1331, 28 U.S.C. §1367, and other applicable law.

20. This Court has personal jurisdiction over Defendants pursuant to F.R.C.P. 4 and other applicable law.  The contacts of the Defendants with this state and this judicial district are sufficient for the exercise of personal jurisdiction over the Defendants and do comply with traditional notions of fair play and substantial justice.

21.  Venue is appropriate in this Court pursuant to 29 U.S.C.A. §185, 28 U.S.C. §1391,  and other applicable law.  The District of New Jersey, Camden Division, is a district in which the Union's duly authorized officers or agents are engaged in representing or acting for employee members, and all of the events or omissions giving rise to the claims took place in this judicial district.

## STATEMENT OF FACTS

22. Mattera was hired on December 5, 2014 by the City of North Wildwood as a laborer, with a starting hourly wage of $10.69 per hour.

23. As a laborer, Mattera was responsible for collecting trash on the streets, and performed a variety of activities for Public Works including snow removal, cleaning of offices, and other maintenance responsibilities, such as keeping the beaches clean and maintained.

24. On her first day of orientation, Mattera was told that there would be a sign-up sheet for overtime on Saturdays, Sundays, and Mondays.

25. Eventually, Mattera was approached and asked if she would like to work in the "Sewer Department."

26. Mattera said "yes," and that she would be able to be "on call" with a pager once every three weeks, which would allow her to make more money in overtime hours.

27. Mattera also regularly signed up for overtime on the sign-up sheet, and was eager for additional overtime opportunities.

**Mattera, During her Beach Maintenance Duties, Saves the Life of a Drowning Man**

28. On or about August 15, 2015, Mattera was working  overtime, while performing her beach maintenance duties.

29. She was stopped by someone at 18th Street and the Beach, and told that there was an abandoned cooler and chair by the edge of the water.

30. Mattera drove the John Deere she was operating to the location and happened upon a group of people yelling for help.

31. She observed that two people were stuck in the water and having problems getting ashore.

32. Mattera then called the Police Department and went into the water to retrieve the individuals. One individual made it to shore on his own. Mattera saved the other drowning man.

6

33. On or about September 1, 2015, Mattera received a "Proclamation" from Mayor Patrick Rosenello and City Council President, Salvatore Zampirri, for her heroic efforts in saving the individual.

34. The Proclamation stated that

    **Whereas**, On Saturday, August 15, 2015, Maria G. Mattera, an employee of North Wildwood Public Works Department, while in the course of her beach maintenance duties, successfully rescued a gentleman in the ocean water at the 18th Avenue beach; and,

    **Whereas**, Realizing the swimmer was in a distressful life threatening situation, using her experience and instinct, entered the ocean to bring the man safely to shore; and,

    **Whereas**, Without regard for her own safety, her quick response and tireless efforts, averted a tragedy and saved the life of an individual. She is commended for her uncommon concern for her fellow man; and, public service "Above and Beyond the Call of Duty."

    **Now Therefore**, The Mayor and City Council of the City of North Wildwood hereby extend their praise and heartfelt thank you to Maria G. Mattera.

    ***

35. Mattera was publicly recognized at a City Council meeting for her heroic efforts, and commended for saving a drowning man.

**Yet, Mattera is Passed up for Promotional Opportunities in Favor of Less Experienced Male Employees**

36. In or about August, 2015, Sloan distributed a memo to all employees in Public Works. This memo instructed anyone who was interested in taking a class on how to operate loaders and/or  anyone with prior experience in operating loaders,  to submit a letter to Sloan.

37. Mattera submitted a letter to Sloan highlighting her interest and also explained that she had previous experience operating loaders from her previous employer, Middle Township, from before she began work with the City of North Wildwood.

38. On or about October 21, 2015, during roll call, Chester read the names of those who were chosen for the loader class to the employees.

39. Mattera was not chosen, despite adhering to Sloan's instructions.

40. However, a male employee, McCann, who had not even completed his 90-day provisional period, was chosen.

41. Mattera confronted Chester, stating that if Sloan did not sign Mattera up, Mattera would go to a higher authority, and she reported that the new male employee was being favored over her (a female employee).

42. After her report to Chester of the favoritism, Chester informed Mattera that she had been put into the class.

43. Operating loaders is one of the duties of a Public Works repairer, a position that pays more than Mattera's position at this time, of a laborer, and that would have also opened up additional opportunities for her to make more money and overtime.

**Mattera Attempts to Improve her Knowledge and Expertise by Enrolling in Classes**

44. Mattera continued to feel as though Public Works, and particularly Sloan, was giving preferential treatment to male employees.

45. In or about August, 2015, Mattera received a course guide from Cape May Vo-Tech School in the mail.

46. Mattera was interested in taking the class "Intro to Water and Wastewater" and expressed this interest to Sloan.

47. Sloan replied "I don't think the City is going in that direction." Mattera replied, "It is in the job that I do." Sloan replied, "He would have to look, as the city pays someone already."

48. Feeling as though Sloan would not do anything, Mattera informed Wozunk, who said he would talk to Sloan.

49. Shortly thereafter, Mattera was called into Sloan's office and was told that McCann (hired just weeks before, on or about August 4, 2015) and she were going to the class.

50. McCann was just hired weeks before and had not even completed his probationary period and, to the best of Mattera's knowledge, never asked to go to the class.

51. School began on September 9, 2015, and was paid for by the city. Classes were twice a week, Monday and Wednesday, and were taught by two teachers in two individual sections. The instructors suggested that books were needed for the class.

52. On or about October 26, 2015, Mattera asked Sloan for the books for the class. Sloan responded "Is it a hinderance if you didn't have books?"

53. Mattera was confused and shocked as to his answer. Eventually, Sloan gave Mattera the books.

**A Persistent Pattern of Male Favoritism Continued to Confront Mattera at Public Works**

54. Throughout the summer of 2015, Mattera asked Sloan numerous times if she could learn to manage different pieces of equipment, including loaders, packers, sweepers and fast tracs.

55. Despite her requests, Mattera was not given the opportunity to learn how to manage these different pieces of equipment, although other male employees, even some with significantly less seniority than Mattera, were allowed to learn to manage this equipment.

56. The rule at Public Works, under Wozunk, was that all employees were required to have a CDL within 90 days of hiring.

57. Mattera had her CDL "A" prior to being hired by Public Works, but a male employee, Onuskanych, who was hired in or about the fall of 2015, was given the job without a CDL and permitted to continue working there.

58. Onuskanych was hired without an advertisement being placed in the local papers and was given more opportunities than Mattera.

59. Onuskanych was eventually named the alternate shop steward, and Sloan had commented that, had Mattera run for alternate shop steward, she would have lost 30 to 1, with the only vote for Mattera being her own vote for herself.

60. The instances of favoritism towards male employees of Public Works continued through 2015 and into 2016 and 2017, when things became substantially worse.

**<u>Sloan Denies Mattera Opportunities to Drive Heavy Equipment Because She is a Woman and Publicly Embarrasses Her</u>**

61. Throughout 2016 and into 2017, Sloan continued to deny Mattera opportunities that were instead given to male employees.

62. Among these, Sloan denied Mattera the ability to drive heavy equipment, but allowed other male employees to drive the equipment.

63. Before operating heavy equipment, one is required to attend classes and receive proper documentation before being hired to operate.

10

64. Mattera is fully licensed to operate heavy equipment, but some of the male employees that Sloan allowed to operate it weren't even licensed to do so.  She was not permitted to operate the equipment, and unlicensed males were.

65. Any attempt now to justify their actions by defendants is pretext.

**Sloan Recurrently Denies Mattera Overtime Opportunities in Violation of Policy**

66. On August 27. 2016, Mayor Patrick Rosenello sent Mattera a letter notifying her that she was promoted to the position of Public Works repairer.  With this promotion came a pay increase of approximately 10%.

67. As a repairer, Mattera would engage in many activities including running the jet-vac truck during the summer months, maintenance, snow removal during the winter, trash pick up, and other maintenance duties.

68. Although the Mayor has recognized Mattera for her heroic efforts, and notified her of her promotion, Sloan continuously engaged in a recurrent pattern of favoring male employees over her.

69. During the course of the winter months of late 2016 and early 2017, the male employees were permitted to do welding, painting, and to operate certain equipment, and every time Mattera was asked to be permitted to do these things she was told, "No."

70. Sloan recurrently denied Mattera opportunities for overtime. He provided overtime opportunities to male employees before he provided them to her.

71. Sloan also did not follow policy in his issuance of overtime, often giving it to employees who did not have enough hours, or who had not completed their provisional period.

72. For every hour of lost overtime, Mattera loses a potential $19.00/hour.

73. Sloan often skips over Mattera when it is her turn for overtime, in violation of the normal procedures in place at Public Works.

74. The employees were on an alternating schedule, each having a sequential turn to be called in for overtime, however, Sloan would often skip Mattera when she was scheduled to work - when it was her turn.

75. For example, during a snowstorm, Sloan skipped over Mattera's name and gave the overtime to a male employee who was still in his provisional period.

76. This occurred on January 29, 2017, when Chester was called in to do overtime instead of Mattera.

77. The next day, on or about January 30, 2017, Chester said to Mattera, "I am tired of my penis, and you can have it."

78. Mattera reported this statement to Sloan, and wanted to file a complaint about this but Sloan told her that, even if she filed a complaint, he was not going to write up Chester. Instead, Sloan drafted a warning letter *to Mattera* because she used the word penis when reporting Chester's statement to him.

79. Sloan reprimanded Mattera for using the word "penis" when she only used it to report that another, male employee, had said it to her, and yet he did not punish the male employee.

**Mattera Reports Matters of Public Concern**

80.  In or about January 2017, Mattera was driving a truck that was filled with salt before a storm, and was trying to park it inside a garage.

81. There was a group of people standing there when she was trying to back it up. No one would help her guide the truck into the garage.

82. Eventually someone did help her to guide it in.

83. She reported the crew's failure to Sloan, who brought her into the office with Halliday, the shop steward, and talked with her about it. Sloan said that she was trying to back up the truck, and people were standing there and would not help, which endangered public safety.

84. Mattera reported this concern to Sloan, and afterwards Halliday, the shop steward, began calling her a "rat" and "troublemaker," for squealing on their safety violations.

85. Mattera was only concerned with safety, and that proper protocols were followed when backing trucks into the garage, and that people could be hurt if they were not, and yet she was reprimanded for trying to speak out to ensure public safety.

**Mattera Reports Sloan for Male Favoritism**

86. In January 2017, things became incredibly hostile. Sloan began threatening to write up Mattera, who had a few injuries in the course of employment, first calling her into the office without a shop steward.

87. Sloan alleged Mattera was unsafe, and, on January 30, 2017 called her into his office to inform her that she was being written up for being unsafe, but she refused to sign the document.

88. On February 1, 2017 Mattera did follow policy by filing a complaint with Yecco, the city business administrator, against Sloan for skipping over her when it was her turn for

13

overtime, and instead providing the overtime opportunity to a male employee, despite that she feared Sloan may retaliate against her for reporting his violations.

89. On that same day, in a letter dated February 1, 2017, Yecco responded to Mattera's complaint; he stated that "supervisors determine employee overtime assignments, with or without approval of the department director…" and that the matter "is deemed closed."

**Sloan Retaliates Against Mattera for Filing a Complaint Against Him**

90. On February 2, 2017, one day after Mattera filed the complaint against Sloan (alleging male favoritism), Mattera was issued an "Employee Warning Notice," which reprimanded her for "Verbally disrespecting Supervisors," and subjecting her to "increased supervisory review."  On the "supervisor" signature line of this reprimand is Sloan's signature.

91. Mattera was then assigned to "trash" duty.

92. Causing additional undue embarrassment, Sloan announced to her colleagues that Mattera made over $10,000.00 in overtime in 2016, a private fact that should not have been shared with her colleagues.

93. Mattera was thereafter falsely accused of putting coolant in a J3 JCB front loader, which led to the machine breaking down, and Mattera was prohibited from utilizing this equipment going forward.  This was something she did not do, but Sloan attempted to blame her for doing, and Sloan threatened to have her arrested and brought up on charges if he could prove that she did it.

**Mattera Exercises Her Right to Intermittent Family Leave, and is Retaliated Against**

94. In or about November 2016, Mattera filed an application for intermittent family leave with human resources.  The leave was necessary to provide for the care of her mother, who is unable to drive to her own medical appointments, after her mother suffered from a traumatic brain injury.

95. Mattera was told by human resources employee, Barbara Boyle ("Boyle") that her intermittent leave application was approved.

96. Accordingly, Mattera took leave on April 10, 2017, to assist her mother with going to medical appointments.  She also took leave for the morning of April 11, 2017, from approximately 7am until 9:30am to care for her mother.

97. On or about April 11, 2017, the same day that she took leave, Sloan issued a notice of minor disciplinary action against Mattera.  He claimed the notice was the result of Dillon Mole ("Mole"), who had previously been arrested for obstruction, filing a complaint against Mattera alleging that she had used harassing and insulting words against him.

98. Mattera was suspended from work for one day, April 26, 2017, allegedly because of this incident.

99. Mattera was also scheduled to take family leave on April 27, 2017, but was allowed to move her suspension day from April 26, 2017 to April 27, 2017, since she was going to be taking family leave that day anyway.

100.    On May 2, 2017, Mattera again took leave to care for her sick mother.

### Mattera's Male Coworkers Threaten to Get Her Fired During a Union Meeting

101.    On or about May 19, 2017, Mattera was sitting in the break room at the end of the
day, and Jack Gallagher ("Gallagher") announced that the full-time workers needed to
stay, and the part-time workers could stay if they wanted to, because he had some
information to pass on for the union.

102.    Gallagher announced that being the shop steward was a thankless job.

103.    Gallagher then stated, in front of everyone there, "Maria [Mattera], we know you
called the union."

104.    Gallagher then recommended that Halliday be named the shop steward for another
three years, and when Mattera objected, he said to "go ahead and file a complaint against
me, it won't be the first time," and "we'll see who's out of here first," and then accused
her of saying that "I'll rip your head off and shit down your neck."

105.     Shortly thereafter, Mattera filed a complaint with Yecco, in accordance with policy
and procedure, against Gallagher documenting this incident, and his threat against her,
that he was going to get her fired.

106.    On May 26, 2017, Yecco responded to Mattera's complaint by finding that the issues
underlying the complaint "strictly involved the conduct of union business" and so he
contacted the union regional representative to request a union meeting be held, and "that
there is no cause for further action."   Mattera's complaints were again ignored.

**The Male Employees and Union Leaders Continue to Threaten and Harass Mattera**

107.    On May 31, 2017 Mattera was sitting in the jet vac truck when McCann and Onuskanych came up to the side of the truck and Onuskanych said to Mattera that he was sent there to personally invite her to a union meeting tomorrow.

108.    Onuskanych said that Yecco and Sloan told Onuskanych to tell Mattera about this meeting and that he had just had a meeting with Sloan and Yecco. McCann said he was there as a witness.

109.    The Union meeting was held on June 1, 2017, and was attended by Mattera, Mole, Halliday, Onuskanych, Bobby Geraci, Carl Iacono, Tom Drumm, Rich Redmer, and Jim Gaglani (the business administrator of the Union), and his secretary.

110.    During that union meeting, Mattera discussed the false accusations that had been made against her, including the false accusation that she put coolant in a J3 JCB front wheel loader, which led to the machine breaking down.

111.    In fact, Mattera had not been permitted to operate any heavy equipment or certain other equipment ever since she was falsely accused of breaking the J3 machine.

112.    During that union meeting, Halliday, the shop steward, also re-raised the issues that had previously occurred with Gallagher in the previous union meeting, when Gallagher threatened to have Mattera fired.

113.    During the union meeting on June 1, 2017 some of the other Union members present, attempted to have Mattera expelled from the Union.

114.    Mattera raised a legitimate grievance during this meeting- that she was being accused by Sloan of damaging city property- something she did not do - and the Union responded by threatening to expel her from the Union.

**The Union Representatives Breached Their Duty of Fair Representation**

115.    After this meeting, both Halliday (the shop steward) and Onuskanych (the alternate shop steward) told mechanic Michael Elliott, Jr. ("Elliott") that Mattera claimed, during a Union meeting, that he falsely accused her, and that he "sabotaged" her by putting coolant in the J3 machine.  As a result Elliot sent a letter to Sloan, although Sloan was the person who falsely accused Mattera.

116.    Halliday and Onuskanych were Union representatives, delegated with authority to act on behalf of the Union.

117.    Article II, ¶A of the CBA provides that a grievance includes "administrative decisions" that affect "the terms and conditions of employment of the employee." (**Exhibit A**).

118.    Article II, ¶C of the CBA provides the grievance procedure as the "sole and exclusive method for resolving grievances." (**Exhibit A**).

119.    Article II, ¶C of the CBA requires the Union to file grievances within five (5) working days after the event giving rise to the grievance, "and an earnest effort shall be made" to resolve the dispute.  It goes on to spell out additional deadlines and procedures that the Union must follow for employee grievances.  (**Exhibit A**).

120.    Article XXI of the CBA provides that "The provisions of this Agreement shall be applied equally to all employees without discrimination as to age, sex, sexual orientation,

gender preference, marital or civil union status….Both the City and the Union shall bear the responsibility for complying with this provision of this Agreement." (**Exhibit A**).

121.    Article XXI of the CBA further provides that "The Union recognizes its responsibility as a Bargaining Agent and agrees to represent all employees in the bargaining unit without discrimination, interference, restraint, or coercion." (**Exhibit A**).

122.    The Union did not follow the grievance procedure mandated by the CBA, and did interfere with her right to grievance and to concerted activity during a Union meeting. Instead, the Union representatives ratted Mattera out to Sloan for things that Mattera said while in a Union meeting, plus, many of the things that the Union representatives were reporting to Sloan were inaccurate statements attributed to Mattera.

123.    Sloan then took what the Union said as Gospel and disciplined Mattera, in violation of the procedures existing within the CBA between Wildwood and the Union.

124.    No due process was offered to Mattera after the Union reported her statements made in a Union meeting.

125.    Mattera was sanctioned by Sloan for statements that were made on Union time, not during work hours and not on City time.  These statements were legitimate grievances against the administration, and how the administration falsely accused her of damaging city property.

126.    Although all of these reported conversations occurred solely during a union meeting, when complaints were filed against Mattera for something that occurred solely during a union meeting, she was punished for them.

127.   On the other hand, when Mattera filed a complaint against Gallagher for something that occurred solely during a union meeting, she was told it "strictly involved the conduct of union business" and so "there is no cause for further action."

**Mattera Again Exercises Her Right to Intermittent Leave and is Sanctioned Shortly Thereafter**

128.   On June 13, 2017, Mattera again exercised her right to take medical leave in order to care for her sick mother.

129.   On June 27, 2017, Mattera was issued another notice of minor disciplinary action, this time for allegedly harassing and insulting mechanics Elliott and Hammerstein.  This time, Mattera was suspended for three days,  July 5, 12, and 19, for the accusations made against her.

130.   After Mattera received the suspension notice, she contacted the Union for assistance, and they did nothing, despite her legitimate grievance.

**Mole Files a Complaint Against Mattera with the Municipal Court**

131.   Mattera is now the subject of a municipal matter, where Mole is pressing charges against her for alleged "harassment," claiming she said the very things that Gallagher had said during the Union meeting when he threatened to have her fired.

132.   Mole and his colleagues have made it their mission to fulfill the threat made by Gallagher to Mattera, of getting her fired from employment..

133.   Mattera has recurrently reported these events through the proper chain of authority, but all of her complaints have been dismissed without adequate investigation.

134.   The increasing hostility and the conditions of work became more unbearable, leading to Mattera experiencing extreme anxiety upon going into work, including headaches and nausea.

**<u>Mattera Files for Medical Leave and is Retaliated Against</u>**

135.   Due to the stress and anxiety spurring from these events, Mattera began treatment with Dr. Kammiel in the summer of 2017.

136.   Dr. Kammiel diagnosed Mattera with anxiety and stress, ordered her to treatment, and stated she was unable to work from July 19, 2017 until August 6, 2017.

137.   Mattera, in accordance with her doctor's instructions, took medical leave from July 19, 2017 until August 6, 2017.

138.   Immediately upon her return from medical leave, on August 7, 2017, Mattera arrived to work as she usually did, at 7am, and, before she left the office to begin her maintenance duties, was told by Delinski that Sloan wanted to speak with her.

139.   Sloan came to meet Mattera in the break room, sometime after 7am, and handed her a sheet of paper, and told her to read it.  The paper, which contained an email addressed to Sloan said that:

> Please be certain to advise Ms. Mattera in person when she reports to duty on August 7th of her appointment that day with Dr. Glass at 11:30am AND that her attendance at that "***fitness for duty exam***" is mandatory. It is the position of the City that she will (only) be returned to full duty upon certification from Dr. Glass which certification shall disclose that the employee has recovered to the extent necessary to return to work without limitation.

140.   During this conversation, Sloan told Mattera that she was suspended, to hand in her keys, and that she was not permitted to set foot on city property.

141.   Mattera received the paper, handed in her keys and went home.

142.    On August 9, 2017, Mattera again visited Dr. Kammiel, and, due to the increased levels of stress spurring from the most recent incident, was instructed to take medical leave until September 30, 2017.

143.    Mattera is, at the time of this Complaint, undergoing medical treatment for the anxiety, and was instructed by her doctor to take medical leave from work, due to the stress she is suffering from these events, with an anticipated return date of September 30, 2017.

## LEGAL CLAIMS

### COUNT I

**(Gender Discrimination, NJLAD , N.J.S.A. 10:5-1 et. seq.)**

**AGAINST WILDWOOD AND SLOAN**

144.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

145.    The New Jersey Supreme Court has emphasized that discrimination based on gender is "peculiarly repugnant in a society which prides itself on judging each individual by his or her merits." *Grigoletti,* 118 *N.J.* at 96, 570 *A.*2d 903 (quoting *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 80, 389 *A.*2d 465 (1978)).

146.    Plaintiff suffered intentional discrimination because of her sex, and she is a member of the protected class, based on her gender.

147.    Defendants did discriminate against Plaintiff because of her sex in violation of the New Jersey Law Against Discrimination N.J.S.A. 10:5-1 et. seq. ("LAD").

148.    Plaintiff was qualified for the position which she maintained.

149.   Plaintiff suffered adverse employment decisions and actions.

150.   The adverse actions against Plaintiff took place under circumstances that give rise to an inference of unlawful discrimination.

151.   As a direct and proximate result of Defendants' actions, Plaintiff's rights under the New Jersey Law Against Discrimination have been violated, and she has suffered damages and losses, including monetary and nonmonetary losses because of it.

152.   Therefore, Plaintiff sets forth a prima facie case of discrimination under the NJLAD

153.    Defendants do not have a good faith, legitimate business reason for their decisions to suspend and refuse work to Plaintiff and if they proffer one, it is manufactured and put forth to disguise the real reason, i.e., discrimination and retaliation.

154.   The LAD was enacted "to protect all persons in their civil rights" and "to prevent and eliminate practices of discrimination" [Historical and Statutory Notes, N.J.S.A. 10:5-1]. In enacting the LAD, the legislature found that "practices of discrimination against any of its inhabitants, because of . . . **sex**. . . are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State . . . ." N.J.S.A. 10:5-3. It further declared its "opposition to such practices of discrimination when directed against any person by reason of the . . . **sex** . . . of that person". Recognizing the "personal hardships" and "grievous harm" suffered because of discrimination, the Legislature stated that the LAD should be "liberally construed in combination with other protections available under the laws of this State."

## COUNT II

**(Retaliation, NJLAD , N.J.S.A. 10:5-1 et. seq.)**

### AGAINST WILDWOOD AND SLOAN

155.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety..

156.    Plaintiff engaged in protected activity that was known to the employer, including, but not limited to reporting favoritism to male employees and improper sexual comments.

157.   Plaintiff, after engaging in the protected activity, was thereafter subjected to adverse employment actions and decisions by the employer.

158.    There was a causal link between the protected activity and the adverse employment actions and decisions.

159.   Therefore, Plaintiff makes a prima facie case of retaliation under the Law Against Discrimination, and a presumption is created that the Defendants unlawfully discriminated against her.

160.   Defendants do not have a good faith, legitimate business reason for their decisions to suspend and not provide work to Plaintiff, and if they proffer one, it is manufactured and put forth to disguise the real reason, i.e.,  discrimination and retaliation.

161.   As a direct and proximate result of Defendant's actions, Plaintiffs rights under the New Jersey Law Against Discrimination have been violated, and she has suffered damages and losses, including monetary and nonmonetary losses.

## COUNT III

**(Disability Discrimination, NJLAD , N.J.S.A. 10:5-1 et. seq.)**

**AGAINST WILDWOOD AND SLOAN**

162.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

163.   Plaintiff suffered intentional discrimination because of her disability, and she is a member of the protected class, based on her disability because of Defendants' perception that she has a disability and their treating her as such.

164.   Defendant did discriminate against Plaintiff because of her perceived disability in violation of the New Jersey Law Against Discrimination N.J.S.A. 10:5-1 et. seq. ("LAD").

165.   Plaintiff was qualified for the position which she maintained.

166.   Plaintiff suffered adverse employment decisions and actions.

167.   The adverse actions against Plaintiff took place under circumstances that give rise to an inference of unlawful discrimination.

168.   Additionally, the defendants wrongfully and in discrimination against Plaintiff required Plaintiff to undergo a fitness for duty evaluation as a result of their perception of Plaintiff's disability and/or in retaliation for Plaintiff taking a leave of absence to address her health concerns.

169.   As a direct and proximate result of Defendants' actions, Plaintiff's rights under the New Jersey Law Against Discrimination have been violated, and she has suffered damages and losses, including monetary and nonmonetary losses because of it.

170.    Therefore, Plaintiff sets forth a prima facie case of discrimination under the NJLAD

171.    Defendants do not have a good faith, legitimate business reason for their decisions to suspend and refuse work to Plaintiff and if they proffer one, it is manufactured and put forth to disguise the real reason, i.e., discrimination and retaliation.

172.    The LAD was enacted "to protect all persons in their civil rights" and "to prevent and eliminate practices of discrimination" [Historical and Statutory Notes, N.J.S.A. 10:5-1]. In enacting the LAD, the legislature found that "practices of discrimination against any of its inhabitants, because of . . . **disability**. . . are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State . . . ." N.J.S.A. 10:5-3. It further declared its "opposition to such practices of discrimination when directed against any person by reason of the . . . **disability** . . . of that person". Recognizing the "personal hardships" and "grievous harm" suffered because of discrimination, the Legislature stated that the LAD should be "liberally construed in combination with other protections available under the laws of this State."

## COUNT IV

### (NJFLA, N.J.S.A. 34:11B-1 et seq. )

### AGAINST WILDWOOD

173.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

174.    The New Jersey Legislature "declares that it is the policy of the State to protect and promote the stability and economic security of family units. The Legislature further declares that employees should be entitled to take a period of leave upon the birth or placement for adoption of a child or serious health condition of a family member without risk of termination of employment or retaliation by employers and without loss of certain benefits." N.J. Stat. Ann. §34:11B-2.

175.    The New Jersey Family Leave Act provides that "It shall be unlawful for any employer to interfere with, restrain or deny the exercise of, or the attempt to exercise, the rights provided under this act or to withhold the benefits provided for under this act." N.J. Stat. Ann. § 34:11B-9.

176.    Plaintiff is an "employee" and the City of North Wildwood is an "employer" within the meaning of N.J.S.A. 34:11B-3, and she is eligible and subject to the protections of this Act, and is employed by the Defendant.

177.    Plaintiff was performing satisfactorily as an employee of her employer.

178.    A qualifying member of Plaintiff's family was seriously injured.

179.     Plaintiff took and sought to take intermittent leave from her employment to care for her injured relative (protected activity), per N.J.S.A. 34:11B-4.

180.    Plaintiff, after engaging in the protected activity, was thereafter subjected to adverse employment actions and decisions by the employer.

181.     There was a causal link between the protected activity and the adverse employment actions and decisions.

182.    Therefore, Plaintiff makes a prima facie case under the Family Leave Act, and a presumption is created that the employer unlawfully interfered with these rights. See *DePalma v. Bldg. Inspection Underwriters*, 350 N.J. Super. 195, 794 A.2d 848 (App. Div. 2002)

183.    Defendant does not have a good faith, legitimate business reason for its decision to suspend and not provide work to Plaintiff, and if it proffers one, it is manufactured and put forth to disguise the real reason, i.e., discrimination and retaliation.

184.    As a direct and proximate result of Defendant's actions, Plaintiffs rights under the New Jersey Family Leave Act have been violated, and she has suffered damages and losses, including monetary and nonmonetary losses.

## COUNT V

**(Breach of Duty of Fair Representation, LMRA, 29 U.S.C.A. § 141 et seq.)**

**AGAINST THE UNION**

185.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

186.    The Union has a duty to engage in the fair representation of the members of the Union.

187.    Plaintiff is a member of the Union, and is entitled to fair representation.

188.    The duty of fair representation requires union representatives "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S. Ct. 903, 910, 17 L. Ed. 2d 842 (1967).

189.   The employer's and Union's actions violated the terms of the collective bargaining agreement between the Union and the employer, did not serve the interests of Plaintiff without hostility, did not act in good faith and honesty, and resulted in undermining Plaintiff's interest.

190.   By breaching Union protocols and agreements, and reporting private details of concerted activity that was spoken during a Union meeting to an employer without permission, and not in accordance with the CBA, and by Defendants discriminating against Plaintiff in violation of the CBA and not acting in her interest, the duty of fair representation was breached.

191.   The Union acted in an arbitrary, discriminatory, and bad faith manner.

192.    The Union's conduct seriously undermined the arbitration process.

193.   Plaintiff was sanctioned by her employer, and reprimanded, as a result of the Union representatives ignoring the mandatory grievance procedures, and Defendants were discriminating against her and not acting in good faith.

194.   As a direct and proximate result of the breaches, Plaintiff's rights to fair representation have been violated, and she has suffered damages and losses, including monetary and nonmonetary losses.

## COUNT VI

**(FMLA Retaliation, 29 U.S.C.A. § 2601 et seq.)**

**AGAINST WILDWOOD**

195.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

196.   The FMLA provides that "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C.A. § 2615(a)(2).

197.   Plaintiff is an "eligible employee" and Defendant is an "employer" within the meaning of  29 U.S.C.A. § 2611.

198.   Plaintiff invoked her right to FMLA-qualifying leave.

199.   Plaintiff suffered an adverse employment decision, including, but not limited to her suspension.

200.   The adverse action was causally related to her invocation of rights.

201.   Therefore, Plaintiff makes a prima facie case under the Family Medical Leave Act, and a presumption is created that the employer unlawfully retaliated against Plaintiff.

202.   Defendant does not have a good faith, legitimate business reason for its decision to suspend and not provide work to Plaintiff, and to require her to attend a psychological fitness for duty exam,and if it proffers one, it is manufactured and put forth to disguise the real reason, i.e.,  discrimination and retaliation.

203.   As a direct and proximate result of Defendant's actions, Plaintiffs rights under the Family Medical Leave Act have been violated, and she has suffered damages and losses, including monetary and nonmonetary losses.


## COUNT VII

### New Jersey Civil Rights Act, N.J.S.A. 10:6-2 (enabling statute)
### Illegal Interference with and Retaliation for the Exercise of  the Constitutional Rights to Free Speech, Safety, and to Report Matters of Public Concern, in violation of N.J. Const. Art. 1, ¶¶ 1, 6, & 19.

## AGAINST WILDWOOD AND SLOAN

204.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

205.   The New Jersey Civil Rights Act, N.J.S.A. 10:6-2 states:

> c.   *Any person who has been deprived o*f any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or *any substantive rights, privileges or immunities secured by the Constitution or laws of this State,* or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

206.   The New Jersey Constitution ensures that all public employees "have the right to organize, present to and *make known to the State*, *or any of its political subdivisions or agencies*, their grievances and proposals through representatives of their own choosing." *N.J. Const.*, Art. 1, ¶ 19.

207.   The New Jersey Constitution also mandates that "Every person may *freely speak*, write and publish his sentiments on all subjects, being responsible for the abuse of that right." *N.J. Const.*, Art. 1, ¶ 6.

208.   The New Jersey Constitution also provides that "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining *safety* and happiness." *N.J. Const.*, Art. 1, ¶ 1.

209.   In evaluating violations under the New Jersey Constitution, courts use the standards developed by the United States federal courts under the Federal Constitution and 42

31

U.S.C. § 1983. *Roman Check Cashing v. N.J. Dept. of Banking & Ins.,* 169 N.J. 105, 110 (2001).  See also *Pettit v. New Jersey*, No. CIV. A. 09-CV-3735 N, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011) (collecting cases and finding that "[t]his district has repeatedly interpreted NJCRA analogously to § 1983.")

210.   The New Jersey Supreme Court stated that "public employment is a public trust which imposes upon the employee the performance of certain duties for the common good" *Donevero v. Jersey City Incinerator Auth.*, 75 N.J. Super. 217, 227, 182 A.2d 596, 602 (Law. Div. 1962), *judgment set aside sub nom. McAleer v. Jersey City Incinerator Auth.*, 79 N.J. Super. 142, 190 A.2d 891 (App. Div. 1963).

211.   Retaliation for free speech claims arising under the New Jersey Civil Rights Act are governed by a three-part test: "(1) was the plaintiff speaking as a citizen rather than as a public employee discharging…[his] employment duties; (2) did the plaintiff's statements address a matter of public concern as opposed to a personal interest; and (3) did the plaintiff's employer have  an adequate justification for treating the employee differently from any other member of the general public as a result of the statement [the employee] made." *Montone v. City of Jersey City*, 709 F.3d 181, 193 (3d Cir. 2013) (internal citations and quotations omitted).

212.   Plaintiff did speak as a citizen who was concerned about the general safety of the public community in light of the lack of safety standards at the Department of Public Works.

213.    Plaintiff's statements which do impact public safety, the safety of the community, and the safety of others, is a matter of public concern, and not merely a matter of personal interest.

214.    Plaintiff's employer did not have an adequate justification for treating Plaintiff differently from other members of the general public as a result of the statement, and, any such proffered justification, will be shown to be pretext for retaliation against the Plaintiff.

215.    The specific reports by Plaintiff are matters of public concern, and safety.  Among other things, Plaintiff reported that the employees were engaging in unsafe behavior, and putting each other, and the public at risk.

216.    Moreover, "once the public concern 'threshold' is met," courts "must balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [public employer], in promoting efficiency of the public services it performs through its employee." *Montone v. City of Jersey City*, 709 F.3d 181, 195 (3d Cir. 2013) (quoting *Miller v. Clinton County,* 544 F.3d 542, 548 (3d Cir.2008)).

217.    Plaintiff's speech posed no threat to government efficiency or effectiveness; her internal reports did not pose any threat of disruption.

218.    There was a causal link between Plaintiff's reports and the adverse employment actions and decisions, and such negative decisions were made shortly after her reports.

219.    As a direct and proximate result of these and other acts of retaliation by Defendants, that did violated her rights guaranteed by N.J Constitution Article 1,  ¶¶ *1, 6, & 19,*

Plaintiff has been caused to suffer economic loss, emotional distress and other serious, significant and long lasting losses.

220.    Additionally, the conduct of the City of North Wildwood, Sloan and others "violate[d] clear established statutory or constitutional rights of which a reasonable person would have known." *McGreevy v. Stroup,* 413 F.3d 359 (3d Cir. 2005).

221.    Thus, the City of North Wildwood and Sloan are not entitled to any "qualified immunity."

## PRAYER FOR RELIEF

**WHEREFORE**, these premises considered, Plaintiff requests this court enter judgment in her favor on all counts and specifically:

1.    Award Plaintiff compensatory damages for all monetary and financial losses, including (but not limited to): past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and other past and future pecuniary losses in an amount to be determined by an enlightened jury;

2. Award Plaintiff compensatory damages for non-pecuniary injuries including (but not limited to): emotional stress, anxiety, shame, embarrassment, humiliation, powerlessness, and indignity, in an amount to be determined by an enlightened jury;

3.    Award Plaintiff exemplary and punitive damages in an amount to be determined by an enlightened jury;

4.    Award Plaintiff reasonable attorneys' fees and costs of this action, including expert fees, and other fees and costs permitted by law;

5.    Award Plaintiff other monetary damages to which she may be entitled to under law;

34

6.   Award Plaintiff appropriate pre-judgment and post-judgment interest; and

7.   Award Plaintiff such other relief, including equitable relief and costs, as may be appropriate, fair, and just.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on all of the triable issues of this Complaint pursuant to F.R.C.P. 38, and other applicable law.

Respectfully Submitted,

By:    *Michelle J. Douglass*

MICHELLE J. DOUGLASS, ESQ.

MY RIGHTS LAWYERS, LLC
The Douglass Law Group
Michelle J. Douglass, Esq.
Attorney Id. No. 025091988
424 Bethel Road
Somers Point, NJ 08244
T: 6097883595 | F: 6097883599
mjd@myrightslawyers.com
Attorneys for Plaintiff, Maria Mattera

DATED: September 6, 2017.

# EXHIBIT A

AGREEMENT

BETWEEN

CITY OF NORTH WILDWOOD, NEW JERSEY

AND

UNITED PUBLIC SERVICE EMPLOYEES UNION

JANUARY 1, 2016 THROUGH DECEMBER 31, 2019

Execution Draft

1

## INDEX

|  | Preamble | 3 |
|---|---|---|
| I | Association Recognition | 4 |
| II | Grievance Procedure and Arbitration | 5 |
| III | Management Rights | 10 |
| IV | Safety | 12 |
| V | Jury Duty | 13 |
| VI | Bereavement Leave | 14 |
| VII | Insurance, Health and Welfare | 15 |
| VIII | Hours and Working Conditions | 20 |
| IX | Overtime and Compensatory Time | 23 |
| X | No Strike or Lockout Pledge | 25 |
| XI | Vacation/Personal Leave | 26 |
| XII | Check-off, Agency Shop, Pay Day and Payroll | 29 |
| XIII | Sick Leave | 31 |
| XIV | Holidays | 34 |
| XV | Time to Attend Meetings | 36 |
| XVI | Leave of Absence | 37 |
| XVII | Longevity | 39 |
| XVIII | Wages | 40 |
| XIX | Uniform Allowance | 42 |
| XX | Promotions and Promotional Pay | 44 |
| XXI | Loyalty, Efficiency, No Discrimination | 46 |
| XXII | Drug/Alcohol-Free Workplace and Alcohol Testing | 47 |
| XXIII | Severability | 49 |
| XXIV | Fully Bargained Provisions | 50 |
| XXV | Miscellaneous | 51 |
| XXVI | Fair Labor Standards Act | 53 |
| XXVII | Definitions | 54 |
| XXVIII | Salary Ranges | 56 |
| XXIX | Management Committee | 57 |
| XXX | On Call | 57 |
| XXXI | Duration of Contract | 58 |
|  | Public Works Salary Ranges | 59 |

## PREAMBLE

This Agreement dated this ___2ⁿᵈ___ day of __August__, 2016 by and between the CITY OF NORTH WILDWOOD, a Municipal Corporation of the State of New Jersey, hereinafter referred to as the "City" and the UNITED PUBLIC SERVICE EMPLOYEES UNION, hereinafter referred to as the "Union".

This Agreement is entered into in order to promote and insure harmonious relations, cooperation, and understanding between the City and its employees; to prescribe the rights and duties of the City and its employees; and to provide for the resolution of legitimate grievances; all in order that the public service shall be expedited and effectuated in the best interest of the people of the City of North Wildwood and its employees. It is the intent of the parties that this Agreement be construed in harmony with the laws of the State of New Jersey which govern public employment.

3

## ARTICLE I

## ASSOCIATION RECOGNITION

In accordance with the New Jersey Employer-Employee Relations Act, as amended, and the Rules of the Public Employment Relations Commission, under Docket #RO-2010-017, the Public Employment Relations Commission has certified the United Public Service Employees Union as the exclusive representative of all employees included below for the purposes of collective negotiations with respect to terms and conditions of employment. The representative is responsible for representing the interests of all unit employees without discrimination and without regard to employee organization membership. The representative and the City of North Wildwood shall meet at reasonable times and negotiate in good faith with respect to grievances and terms and conditions of employment as required by the Act.

**UNIT:** Included: All regularly employed full and part-time (20 hours or more) non-supervisory blue collar employees employed by the City of North Wildwood.

Excluded: Managerial executives, confidential employees and supervisors within the meaning of the Act; professional employees, craft employees, police, casual employees and all other employees employed by the City of North Wildwood.

4



## ARTICLE II

## GRIEVANCE PROCEDURE AND ARBITRATION

A. Definition:

The term grievance, as used herein, means any controversy arising from the interpretation, application or violation of policies, agreements and administrative decision which affects the terms and conditions of employment of the employee.

B. Purpose:

1. The purpose of this procedure is to secure at the lowest possible level an equitable solution to the problems which may arise affecting the terms and conditions of the Agreement. The parties agree that this procedure will be kept as informal as may be appropriate.

2. Nothing herein contained shall be construed as limiting the right of any employee having a grievance to discuss the matter informally with any appropriate member of the departmental supervisory staff and having the grievance adjusted without the intervention of the Union.

3. Any grievance may be raised by any employee or by the Union at the request and on behalf of an individual or group of individuals.

C. Steps of the Grievance Procedure:

The following constitutes the sole and exclusive method for resolving grievances between the parties covered by this Agreement and shall be followed in its entirety unless any step is waived by mutual consent. The definition of working days is Monday through Friday, excluding holidays.

STEP ONE:

The aggrieved or the Union shall institute action under the provision hereof within five (5) working days after the event giving rise to the grievance has occurred or within five (5) working days after the aggrieved would reasonably be expected to know of its occurrence, and an earnest effort shall be made to settle the difference between the aggrieved employee and the aggrieved·employee's Department Head for the purpose of resolving the matter informally.

STEP TWO:

If no agreement can be reached orally within ten (10) working days of the initial discussion with the Department Head, the employee or the Union may present the grievance, in writing, within ten (10) working days thereafter to the City Administrator or his/her designated representative. The written grievance at this time shall contain the relevant facts and the remedy requested by the grievant. The City Administrator or his/her designated representative shall conduct a hearing with the Union within ten (10) working days and then shall thereafter respond, in writing, within ten (10) working days after such hearing.

STEP THREE:

If the aggrieved person is not satisfied with disposition of the grievance by the appropriate Committee, the grievance may be submitted to arbitration within thirty (30) calendar days after the expiration of Step Two. A maximum of five (5) grievances shall be submitted to binding arbitration in any calendar year.

6

1.    A request for a list of arbitrators shall be made to the Public Employees Relations Commission by the moving party and both parties shall then be bound by the rules and procedure of P.E.R.C. in the selection of an arbitrator.

2.    The arbitrator shall limit himself/herself to the interpretation and application of the terms of this Agreement and to the issues submitted to him/her and consider no other(s).

3.    The arbitrator shall have no authority to add to, detract from, alter, amend, or modify any provision of this Agreement or impose on any party thereto a limitation or obligation not provided in this Agreement.

4.    The award of the arbitrator on the merits of any grievance within his/her jurisdiction and authority as provided in this Agreement shall be binding upon the parties.    .

5.    The fee of the arbitration shall be borne equally by the party.

D. If a decision is not rendered within the time limits prescribed for decisions at any step in the grievance procedure, then the grievance shall be deemed to have been denied. Nothing herein shall prevent the parties from mutually agreeing to extend or contract the time limits for processing the grievance at any step in the grievance procedure.

Any grievance not presented in accordance with the applicable time limits or other requirements in the steps listed shall be automatically foreclosed according to the last response given.

E. Authorized representatives of the Union, whose names shall be filed in writing with the Mayor or his/her designee, shall be permitted to visit the City's facilities or the office of the City Administrator for the purpose of processing grievances. Any duly authorized representatives of the Union designated in writing, after reporting to the office of

7

the Department Head, shall be admitted to the premises for the purpose of assisting in the adjustment of grievances and investigation of complaints that the contract is being breached. Upon request, the Union representative shall state the purpose of his/her visit. Except in an emergency, at least eight (8) hours advance notice must be given. Such visits shall not be permitted to interfere with, hamper or obstruct normal operations. The Shop Steward will have two (2) hours to conduct investigations and shall suffer no loss of pay.

F.      It is specifically understood and agreed that arbitration shall not be obtainable as a matter of right if the grievance:

a.      involves the existence of alleged violation of any Agreement other than the present Agreement between the parties; or

b.      would require an arbitrator to consider, rule on, or decide any of the following:

i. the elements of a job assignment;

ii. the level, title, or other designation of an employee's job classification;

iii. the right of management to assign or reassign work;

iv. pertains in any way to the establishment or administration of insurance, pension, savings or other benefit plans in which employees are eligible to participate; or

v. involves violations of State Laws and Regulations

G.      The parties agree that the Union may elect to designate five (5) arbitrations to be binding arbitrations during each contract year. It is agreed that the decision of the arbitrator shall be binding on both parties and further that both parties will pay their share

8



50/50 of all costs charged by the arbitrator. Advisory arbitration shall remain for all other arbitrations except for the first five (5) arbitrations elected by the Union during each contract year and it is also agreed that both parties will pay for their share of arbitration 50/50.

        H.      Employee minor disciplinary letters contained in any personnel file, such as for tardiness and other very minor violations, shall be removed after eighteen (18) months provided it was a single occurrence.

## ARTICLE III

## MANAGEMENT RIGHTS

It is recognized that the management of the City, the control of its properties and the maintenance of order and efficiency is a right and responsibility of the City of North Wildwood.

Accordingly, the City hereby retains and reserves unto itself, without limitation, all powers, rights, authority, duties and responsibilities conferred upon and vested in it prior to the signing of this Agreement by the Laws and Constitution of the State of New Jersey and of the United States, including but without limiting the generality of the foregoing, the following rights:

1. To the executive management and administrative control of the municipal government and its properties and facilities and to determine the methods of operation to be offered by its employees and to direct the activities of its employees;

2. To determine the standards of selection of employment and to hire all employees and subject to the provisions of Law, to determine their qualifications and conditions for continued employment or assignment and to promote and transfer employees;

3. To reprimand, suspend, demote, discharge or take other disciplinary action for good and just cause according to Law;

4. To transfer, assign, reassign; lay-off, and recall employees to work;

5. To determine the number of employees and the duties to be performed and to relieve its employees from duty because of lack of work or lack of funding or other legitimate reason in accordance with the Department of Personnel's rules and regulations.

10



6. To maintain the efficiency of its operations and to maintain the efficiency of employees; to establish, expand, reduce, alter, combine, consolidate, or abolish any job or job classification, department operation or service;

7. To determine staffing patterns and areas worked to control and regulate the use of facilities, supplies, equipment, materials and other property to the employer;

8. To determine the number, location and operation of divisions, departments, units and all other work groups of the employer, the assignment of work, the qualifications required, the performance standards and the size and composition of the work force;

9. To determine the amount of overtime to be worked;

10. To determine the methods, means, and personnel by which its operations are to be conducted;

11. To determine the content of work assignments;

12. To exercise complete control and discretion over its organization and the technology of performing its work; and

13. To make, maintain and amend such responsible rules and regulations as it may from time to time deem best for the purpose of maintaining order, safety, and/or the effective and efficient operation of the work for the City.



## ARTICLE IV

## SAFETY

The City shall endeavor to provide conditions of work which are both safe and healthy in conformity with all federal, state and local laws. To that end, a representative of the Union shall serve on the City's Safety Committee.

The City shall make available the reasonably necessary safety items and equipment in order to insure safety and health.

12

## ARTICLE V

### JURY DUTY

A regular employee who loses time from his/her job because of jury duty as certified by the Clerk of the Court, shall be paid by the City the difference between his/her job rate for either eight (8) hours and the daily jury fee, subject to the following conditions:

a. When the jury service is completed prior to 1:00 p.m., the employee is required to telephone the Department Head and report to work if requested.

b. Time lost because of jury service will not be considered for purposes of computing overtime.

c. The employee must notify his/her Supervisor immediately upon receipt of any communication regarding jury service.

d. No reimbursement of wages will be made for jury service during holidays or vacations.

e. At the Department Head's request adequate proof must be presented of time served on a jury and amount received for such services.

13



## ARTICLE VI

## BEREAVEMENT LEAVE

A.    Employees shall be granted time off without loss of pay for the following:

1.  Death in the immediate family, from date of death to and including the day of the funeral.

(a)  Immediate family shall consist of spouse, domestic or civil union partner, child, stepchild, mother, father, brother, sister, stepmother, stepfather, grandmother, grandfather, grandchildren, mother-in-law, father-in-law, brother-in-law and sister-in-law.

(b)  Maximum time off for any one occurrence shall be three (3) days. This time is not to be deducted from any other benefits.

2.  Employees shall also be granted time off for the death of an aunt, uncle or first cousin. The maximum time off shall be one (1) day. This time is not to be deducted from any other benefits.

3. The City may request documentation from the employee concerning proof of death and a signed statement as to the relationship of the employee to the deceased.

14



## ARTICLE VII

### INSURANCE, HEALTH AND WELFARE

A.   <u>Hospitalization and Medical Care</u>.  The CITY shall continue to provide hospitalization insurance through New Jersey State Health Benefits Plan, as it exists or as modified by the State Health Benefit Program (or any other substantially similar health benefit plan), including any changes in co-pays or deductibles that may be implemented by the New Jersey State Health Benefits Program, for all employees and eligible dependents covered by this Agreement. The CITY agrees to pay the full cost of the NJSHBP Direct 15 Plan for employees and their eligible dependents. An employee may select coverage of another Plan offered by the NJSHBP and in the event the selected plan costs more than the Direct 15 Plan then the employee shall be responsible for paying the costs of the increased premium for the selected coverage. Payment shall be made by equal payroll deductions. Employees shall only be permitted to enroll in the type of coverage for which the employee is eligible.

Effective January 1, 2016, the City may satisfy its agreement to provide coverage under the NJSHBP Direct 15 Plan or a substantially similar plan by providing coverage under the NJSHBP 2030 Plan together with a Flex Payment Card which provides for payments of Co-Pays required under the NJSHBP 2030 Plan.

B.   <u>Prescription Plan.</u>  The CITY shall provide a Co-Pay Prescription Plan for the individual and his family.

Presently, the CITY provides the Prescription Plan through the State Health Benefits Plan.

Co-pays for generic prescriptions are currently Three Dollars ($3.00) and Ten Dollars

15

($10.00) for brand name prescriptions (per current State Health Benefit rates) and are subject to future additional changes to reflect the then applicable State Health Benefit Plan prescription co-pays.

In the event the CITY no longer provides health care benefits or prescription coverage under the State Health Benefits Plan, then in such event the co-payment for the Prescription Plan shall be $10.00 for mail in prescriptions, $15.00 for generic drugs and $25.00 for brand name drugs.

All benefits under the Prescription Drug Program are subject to the terms of the Group Policy.

C.     Dental Plan. The CITY shall provide a Dental Insurance Program, which includes all of the benefits which are currently included in the Dental Insurance Program, at the date of this Agreement, for the employee and his/her eligible dependants to commence sixty (60) days after the commencement of current active employment. Further, the City may change the dental insurance plan or provider so long as the level of benefits provided to the employee and his/her eligible dependents is substantially similar.

D.     Opt-Out. The New Jersey State Health Benefits Program (SHBP) provides that a municipality may allow an employee as a dependent by a spouse's employer to waive SHBP health benefits coverage. The decision of a municipality to allow its employees to waive coverage and the amount of consideration to be paid are not subject to collective bargaining.

Consistent with the provisions of the applicable law, the City is willing to adopt an Opt-Out Payment Plan as follows:

Employees enrolled in the health insurance coverage plan provided in Article VII Section A may elect to waive all coverage, provided proof of coverage through another source can be

16



demonstrated. Employees who waive all coverage shall receive an end-of-year payment in the amount of twenty-five (25%) percent of the applicable premium for the insurance plan or $2,000, whichever is less, in lieu of the insurance, based on the number of months that the insurance was waived during the year. Payment shall be in the amount of twenty-five (25%) percent of the applicable premium, or $2,000, whichever is less. Checks for opting out will be issued on or about December 1st of each year.

An employee who waives coverage shall be permitted to resume coverage by making an application for coverage during an open enrollment period in accordance with the provisions of the State Health Benefits Program.

Further, an employee who waives coverage shall be permitted to immediately resume coverage if the employee ceases to be eligible for other health care coverage for any reason, including, but not limited to, the retirement or death of the spouse or divorce. An employee who resumes coverage shall repay, on a pro rata basis, any amount received from the employer which represents an advance payment for a period of time during which coverage was resumed. An employee who wishes to resume coverage shall notify the employer in writing and file a declaration with the division, in such form as the director of the division shall prescribe, that the waiver is revoked.

Further in accordance with the provisions of the applicable law which provides that the decision of a municipality to allow its employees to waive coverage and the amount of consideration to be paid are not subject to collective bargaining, the City maintains the right to terminate, revise and modify the Opt-Out Payment Plan set forth herein.

E.      Change in Plans and Providers.   The City may, at its option, change any of the

17

existing insurance plans or carriers providing such benefits so long as the benefits which are provided to the employees and their eligible dependents are substantially similar to the coverages and benefits currently provided to employees. The City further reserves the right, at its option, to self-insure any of the plans or coverages so long as the benefits which are provided to the employees and their eligible dependents are substantially similar to the coverages and benefits currently provided to employees. Disagreements regarding coverage changes can go to the grievance process and to arbitration. The CITY will notify the Union at least thirty (30) days before any change is to happen. Selection of the carrier or carriers is a managerial prerogative not subject to the terms of this collective bargaining agreement.

      F.     <u>Health Benefits/Worker's Compensation.</u> The City is to pay the cost of Group Health Insurance while an employee is receiving worker's compensation. The City will also pay this cost while the employee is out of work with a non-work related disability after employee has used half of available sick days he/she has coming to them for a period of up to twelve (12) months. At no time is he/she required to use their last fifteen (15) days.

      G.     <u>Retiree Health Benefits.</u> Upon an Employee's retirement he/she shall be entitled to receive all of the then health care benefits provided by the CITY at the expense of the City of North Wildwood for the shorter of the following periods:

      1.     For a period of three (3) years or when he/she obtains other employment having comparable coverage to that provided by the CITY (once the job is obtained, the benefits terminate even if the employment terminates within three (3) years).

      2.     When an Employee becomes eligible for Medicare.

      Retirement, for the purpose of this Article shall be consistent with the standards set

18

## ARTICLE VIII

## HOURS AND WORKING CONDITIONS

A.     The work week shall consist of seven (7) consecutive days beginning at 12:01 a.m. Saturday and ending at 12:00 midnight Friday.  This shall not be construed and nothing in the Agreement shall be construed as a guarantee of limitation of the number of hours to be worked per day, per week or for any other period of time by employees covered hereunder.  Work week shall normally be comprised of an either eight (8) hour work day and a forty (40) hour work week.

B.  ·   During the Summer Season from the Saturday of Memorial Day Weekend and ending the third Friday in September or on the Friday of the Irish Festival, whichever occurs later, the City may direct that a six (6) consecutive day rotating schedule be in effect for such positions as the City deems necessary. At no time will an employee be required to work seven (7) consecutive days, unless an emergency exists. During the Summer period, the employee's 'day off' will be scheduled to be either a Tuesday, Wednesday or Thursday, Once designated, the "day off" shall remain the same.

Effective during the Summer Season of 2017, from the Saturday of Memorial Day Weekend and ending September 30th or on the <u>Wednesday following the</u> Irish Festival, whichever occurs later, the City may direct that a six (6) consecutive day rotating schedule be in effect for such positions as the City deems necessary.  At no time will an employee be required to work seven (7) consecutive days, unless an emergency exists.  During the Summer period, the employee's "day off" will be scheduled to be either a Tuesday, Wednesday or Thursday.

Effective with the Summer Schedule in 2017, employees shall be compensated at one and one half times their regular rate of pay for all hours actually worked on a Saturday or Sunday

20



regardless of the amount of hours actually worked during the week. This shall only be in effect for the time period in which the Summer Schedule is in effect.

      C.      Overtime wages will not be paid unless the six (6) day schedule entails   more than forty (40) hours. The City may request that an employee voluntarily work the seventh (7th) consecutive day in any week. In the event the employee agrees to work the seventh (7th) day, the employee shall be paid at double time for the hours actually worked during the seventh (7th) day. In the event of a storm event, the City may direct that an employee work the seventh (7th) consecutive day in any week in which event the employee shall be paid at double time for the hours actually worked during the seventh (7th) day.

      D.      Employees shall be entitled to two (2) fifteen (15) minute coffee breaks and one (1) thirty (30) minute lunch in every eight (8) hour shift. The City shall have the right to issue rules and regulations regarding when and how such break and the lunch period shall be taken by the employees. Only time actually worked during an overtime shift will be paid.

      E.      <u>Stand-by Beeper:</u>

            1.      Each employee designated to be on stand-by will be required to carry a beeper during the stand-by period. If an employee is not called in on a holiday, he shall be entitled to three (3) hours of comp-time per day. Weekday or weekend stand-by, if not called in, shall be one (1) hour of comp-time per day.

            2.      If an employee is called in for non-scheduled overtime, he shall be guaranteed a minimum of three (3) hours compensation whether or not the three hours are

21



worked, except when the end of the call-in period coincides with the beginning of his/her regularly scheduled shift.

3.    Any employee who wishes to have another employee cover their stand-by will have the employee sign a copy of attached Agreement, which will be approved by the Department of Public Works Department Head.

F.    In the event that the Department of Personnel eliminates any job title, which is currently in the bargaining unit and workers are placed into either an existing job title or a newly created job title, the employer agrees to negotiate over the wage rate of the job title(s) in which workers are placed, if there is no wage rate to cover that particular title. Such negotiations will only be concerned with the wage rate for the newly created title and will have no effect on any existing rates in the salary scale. Additionally, in the event that two (2) or more existing job titles, which are currently paid at different rates are consolidated into one title, the pay rate of the highest rate job shall become the wage rate for the consolidated title.

G.    The following form will be used for the assignment of Stand-by Time:

*****

DATE: _____

I, _____, have agreed to cover the following stand-by time _____ for _____. I will be responsible for any call-outs during this period.    I will use a beeper at all such times.

_____
SIGNATURE

APPROVED BY:

_____
DEPARTMENT OF PUBLIC WORKS DEPARTMENT HEAD    *****

22



## ARTICLE IX
## OVERTIME AND COMPENSATORY TIME

All hours worked in excess of either eight (8) hours per day, or forty (40) hours per week shall be considered overtime and employees shall receive compensatory time off at the rate of time and one-half for each hour. However, no compensatory time shall be worked nor shall any compensatory time be given unless said compensatory time has been specifically authorized by the Department Head or other appropriate managerial executive prior to its being worked. Compensatory time shall be compensated in one-quarter (1/4) hour units, fractional portions being counted as a full quarter (1/4) hour. No compensation shall be made for an initial period of less than fifteen (15) minutes. Employees may be required to work in excess of the hours designated as the normal work week for their class title. The City shall distribute compensatory time as equitable as possible and in the best interest of the City. When practicable, compensatory time shall be held to within classification.

Employees shall use compensatory time off during the year in which it was earned, unless prohibited to do so by the City, in which event the denied compensatory time off can be carried forward to the next year. In no event shall any employee accumulate more than two hundred forty (240) hours of compensatory time as permitted under the FLSA. Effective December 1, 2012, all compensatory time must be used by employees prior to their retirement or other separation from employment with the City.

Compensatory time off must be taken upon approval of the City, but not less than four (4) hour increments. All employees shall submit requests for approval of the use of compensatory time off at least twenty-four (24) hours in advance.

23



Case 1:17-cv-06841-JHR-AMD   Document 1   Filed 09/06/17   Page 59 of 89 PageID: 59

## ARTICLE X

## NO STRIKE OR LOCKOUT PLEDGE

Neither the Union nor the employee of the employer shall interfere, instigate, promote, sponsor, engage in, or condone any strike or lockout. In the event that any person violates the terms of the no-strike clause, the public employer shall have the right to discharge or otherwise discipline such person. In the event that an arbitration proceeding is instituted, which involves a breach of the no-strike clause, the sole question for the arbitrator shall be whether the employee was engaged in the prohibited activity.

The Union will actively discourage and will take whatever affirmative steps necessary to prevent or terminate any strike, work stoppage, slowdown, walk-out, or other job action against the City.

Nothing contained in this Agreement shall be construed to limit or restrict the City in its right to seek and obtain such judicial relief as it may be entitled to have under the law.

The City agrees that it will not engage in a lock-out or other similar action because of any proposed changes in the Agreement or disputes over matters relating to the Agreement.

25

Case 1:17-cv-06841-JHR-AMD   Document 1   Filed 09/06/17   Page 60 of 89 PageID: 60

## ARTICLE XI

### VACATION/PERSONAL LEAVE

1.    Annual Vacation Leave with pay for employees hired prior to the execution of this Agreement shall be earned at the rates set forth below:

    a. Up to one (1) year of service - one (1) working day's vacation for each month of service.

    b. After one (1) year and to the completion of eight (8) years of service twelve (12) working days vacation.

    c. After eight (8) years and to the completion of fifteen (15) years of service - fifteen (15) working days vacation.

    d. After fifteen (15) years and to the completion of twenty-two (22) years of service - twenty (20) working days vacation.

    e. After twenty-two (22) years and to retirement - twenty-five (25) working days vacation.

2.    Annual Vacation Leave with pay for All New Hires employed after January 1, 2005 shall be earned at the rates set forth below:

    a. up to one (1) year of service - one (1) working day's vacation for each month of service;

    b. first full calendar year of employment up to the completion of ten (10) years of continuous service - twelve (12) working day's vacation;

    c. after ten (10) years up to the completion of twenty (20) years of continuous service - fifteen (15) working day's vacation;

    d. after 20 years and to retirement - twenty (20) working day's vacation.

26

Carryover of vacation days: Vacation not taken in a given year because of business demands shall accumulate and be granted during the next succeeding year only. Except that any employee hired on or after January 1, 2013, shall in no event be permitted to carry more than an aggregate of ten (10) vacation days from prior years into the next succeeding year.

3.     All vacation shall be granted by the City so far as practicable in accordance with the desires of the employee. Employees shall submit vacation requests at least one (1) month in advance. Preference for vacation time shall be given in order of seniority.

The City will give consideration to vacation requests unless the City determines that the request cannot be granted due to the safe and efficient operation of the department. In order to exercise seniority, vacation requests must be submitted prior to March 1st. The Department Head, or designee, will provide approval of vacation submitted prior to March 1st by March 31st.

After March 1st, vacation leave will be granted on a first come, first serve basis. Also, after March 1st vacation requests of three (3) days or less will require five (5) working days notice and requests for four (4) or more vacation days will require fifteen (15) working days notice.

No more than three (3) employees will be permitted off per week during the period beginning the Monday prior to Memorial Day Weekend through the first Monday in October. If during the months of November and December, more than six (6) employees request vacation during the same week, approval will be at the sole discretion of the City.

It is contemplated that an employee will not take their vacation one day at a time, however, they may do so up to a maximum of five (5) times per year with Department Head authorization.

Any employee who commences employment during the first fifteen (15) days of the month shall be credited with having worked a full month for the purposes of vacation computation. Any

27



employee who commences employment on the sixteenth (16th) day of the month or thereafter shall not be credited with working said month for the purpose of vacation computation.

4.      The City agrees to provide each employee with twenty-four (24) hours of personal leave time. Personal leave hours off shall be granted by the City upon prior request of the employee submitted to the Department Head and/or his designee. Such request will not be unreasonably denied unless emergency circumstances dictate otherwise. Personal leave hours are earned on a pro-rata basis. At the beginning of each calendar year, in anticipation of continued employment, the employee shall be credited with twenty-four (24) hours of personal leave time. An employee who leaves City service before the end of a calendar year, shall have his or her personal leave time hours prorated, based upon time earned. An employee shall reimburse the City for paid personal leave time hours used in excess at his/her prorated entitlement.

## ARTICLE XII

## CHECK-OFF, AGENCY SHOP, PAY DAY AND **PAYROLL**

If authorized voluntarily and in writing to the proper disbursing officer of the City, an employee subject to this Agreement who is a member of the Union may indicate his/her desire to have deductions made from his/her compensation for the purpose of paying usual, customary and uniform dues to the Union.

A check-off shall commence for each employee who signs a properly dated authorization card supplied by the Union and approved by the City during the month following the filing of such card with the City.

In addition, pursuant to N.J.S.A. 34:13A-5.5, the City agrees to deduct from the salaries of its employees subject to this Agreement, but not members of the Union, a representation fee in lieu of dues for services rendered by the majority representative in an amount equal to eighty-five (85%) percent of the regular membership dues, fees and assessments paid by member of the Union, less the cost of benefits financed through the dues and assessments paid by members of the Union, less the cost of benefits financed through the dues and assessments and available to and benefiting only members of the Union. Such deductions shall be made in compliance with Chapter 310, Public Laws of 1967, N.J.S.A. (R.S. 52:14-15.9e), as amended. Said monies, together with records of any corrections shall be transmitted to the Union office during the month following the monthly pay period in which deductions were made. Implementation of a payroll deduction for a representative fee will commence with a notification from a Shop Steward or Union Official, but not to exceed thirty (30) days from date of the notice.

29



If during the life of this Agreement there shall be any change in the rate of membership dues, the Union shall furnish to the City written notice prior to the effective date of such change.

The Union agrees to furnish the City with a copy of its "demand and return system", which must be established and maintained by the Union in accordance with the law.

The Union shall indemnify, defend and save the City harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of any action taken in making deductions and remitting the same to the Union, pursuant to this article.

Any written authorization required herein may be withdrawn at any time by the filing of a notice of such withdrawal with the above mentioned disbursing officer and deduction authorization cannot again be effected for a period of three (3) months.

The normal pay day for employees shall be on a bi-weekly basis to be paid every other Friday. Pay will be distributed at established locations for the various departments. Those employees who shall be on vacation on the normal pay day shall be paid on Thursday, upon request in accordance with procedures of the Chief Financial Officer's Office. All New Hire Employees employed after the date of the execution of this Agreement shall be paid on a bi-weekly basis, to be paid every other Friday. Pay will be distributed through the City's established direct deposit system.

Compulsory deduction from payroll are as follows:

a. Federal & State Withholding Tax

b. F.I.C.A. (Social Security)

c. Pension Deduction (if eligible)

d. Contributory Deduction

e. Unemployment Compensation Insurance

30



**ARTICLE XIII**

**SICK LEAVE**

1. <u>Service Credit for Sick Leave</u>. All employees shall be entitled to sick leave with pay specified hereunder.

a. Sick leave for purposes herein is defined to mean absence from duty of an employee because of personal illness by reason of which such employee is unable to perform the usual duties of his/her position. Sick Leave may be used by employees who are unable to work because of:

1. Personal illness or injury.

2. Exposure to contagious disease.

3. Care for a reasonable period of time of a seriously ill member of the employee's immediate family. "Immediate family" is defined by N.J.A.C. 4A:1-1.3 as employee's spouse, civil union partner, child, legal ward, grandchild, foster child, father, mother, legal guardian, grandfather, grandmother, brother, sister, father-in-law, mother-in-law, and other relatives residing in the employee's household.

2. <u>Amount of Sick Leave</u>.

All employees shall be entitled to sick leave with pay as follows:

a. One (1) working day sick leave with pay for each month of service from the date of regular appointment up to and including December 31st next following such date of appointment.

b. Fifteen (15) working days sick leave with pay for each calendar year thereafter.

3. <u>Reporting of Absence of Sick Leave</u>.

If an employee is absent for reasons that entitle him to sick leave, his/her Department Head or Designee shall be notified by telephone or personal message left at the Public Works Department or its answering machines on or before 7:00AM.

Failure to notify his/her Department Head may be cause of denial of the use of sick leave for the absence and constitute cause for disciplinary action.

Absence without notice for five (5) consecutive days shall constitute a resignation not in good standing.

4. Verification of Sick Leave. An employee who shall be absent on sick leave for five or more consecutive working days or totaling more than 15 days in one calendar year, may be required to submit acceptable medical evidence substantiating the illness from a physician acceptable to the City. Furthermore, the City may require such an employee to be examined by a City-designated physician at the expenses of the City.

a. In case of a leave of absence due to exposure to contagious disease, a Certificate from the Department of Health shall be required prior to the employee's return to work.

b. The City may require an employee who has been absent because of personal illness, as a condition of his/her return to work, to be examined, at the expense of the City, by a physician designated by the City. Such examination shall establish whether the employee is capable of performing his/her normal duties and that his/her return will not jeopardize the health of other employees.

c.      The City may adopt such other sick leave verification procedures as it may deem appropriate. Abuse of sick leave shall be cause for disciplinary action.

The leave is credited in advance at the beginning of the year in anticipation of continued employment for the full year. If an employee required none or only a portion of the allowable sick leave for any calendar year, the amount of unused leave shall accumulate to his credit from year to year. The employee shall be entitled to such accumulated sick leave with pay if and when needed. An employee who leaves employment for any reason during the calendar year shall reimburse the

32

employer for paid working days used in excess of his or her prorated and accumulated entitlement. Part-time permanent employees shall be entitled to sick leave as established by Department of Personnel regulations.

5. <u>Service Associated Injury</u>.

Whenever an employee in the classified Department of Personnel is disabled, as a result of illness or injury entitling said employee to Workmen's Benefits, he shall be entitled to a leave of absence with pay to be known as Service Associated Injury (S.A.I.) Leave (as differentiated from sick leave). Such leave shall be governed by the provisions of Ordinance #693 and applicable state statutes.

6. <u>Retirement:</u>

Once retirement notice is submitted and an employee is no longer working full-time, all accrual of sick and vacation time will cease.

At retirement, during the term of this Agreement, the City agrees to pay each employee an amount up to fifty (50) percent of all accrued and unused sick leave pay up to a maximum of $10,000.

This supplemental compensation payment to be paid hereunder shall be computed at the rate of one-half (2) of the eligible employee's daily rate of pay for each day of earned and unused accumulated sick leave based upon the average annual base compensation received during the last year of his/her employment, prior to the effective date of his/her retirement; provided, however, that no such lump sum supplemental compensation payment shall exceed Ten Thousand Dollars.

Payment shall be made promptly, if funds are available, but not later that one (1) month after the final adoption of the budget of the City of North Wildwood for the year succeeding the effective date of retirement of the employee.

33



## ARTICLE XIV

## <u>HOLIDAYS</u>

Employees shall be entitled to fourteen (14) holidays each year. Said Holidays will be:

> New Year's Day
>
> Martin Luther King, Jr. Day
>
> Presidents Day
>
> Good Friday
>
> Memorial Day
>
> Independence Day
>
> Labor Day
>
> Columbus Day
>
> Election Day
>
> Veterans Day
>
> Thanksgiving Day
>
> Day after Thanksgiving Day
>
> Christmas Eve
>
> Christmas

The actual date each Holiday will be observed will be designated by the Mayor on an annual basis. In the event of the death of a Blue Collar Worker, all compensatory time and vacation days shall be converted into cash, using the regular rate of pay and paid to the estate of the deceased.

When an employee is called upon to work on such designated holiday, he/she shall receive double compensatory time off for all hours actually worked on such holiday.

Holiday compensatory time shall not be allowed an employee unless he is working during the week in which the holiday falls, and is on the job and available for work his/her last full schedule work day before and his/her first full scheduled work day after the holiday, even though in different work weeks, except in case of proved illness or injury verified by a medical certificate or in the case

34



of a pre-planned vacation or pre-planned personal day. In the event of an emergency situation requiring the use of a personal day, the employer may require proof of the "emergency situation" giving rise to the necessity of the use of the personal day. In the event proof is not submitted or is insufficient, the City reserves the right not to compensate the employee for the holiday.

Should a designated holiday be observed on one of the employee's regularly scheduled basic work days within his/her normal working period while he/she is on vacation, said holiday shall not be counted as a vacation day.

Holidays which fall on a Saturday shall be celebrated on the preceding Friday, and holidays which fall on a Sunday shall be celebrated on the following Monday.

Holiday time shall apply to employees holding provisional appointment, pending examination for permanent employment but shall not apply to employees holding temporary emergency or seasonal positions.

Emergency closing by the City for public safety reasons such as weather emergencies are not considered to be additional holidays under this agreement.



## ARTICLE XV

### TIME TO ATTEND MEETINGS

Members of the bargaining unit who by mutual agreement between the Union and the City of North Wildwood, participate during working hours in conferences and meeting with the City which involve or derive from its collective bargaining agreement, shall suffer thereby no loss of pay. Members of the bargaining unit shall be allowed one-half (1/2) hour prior to and one-half (1/2) hour after the conference is over as excused time from their work assignment. They shall give their supervisor reasonable notice in advance of their desire to attend such meetings. It is understood, however, that except for the foregoing, nothing shall be done which shall interfere with the work of any city employees and/or department. Vacation days will be rescheduled if they coincide with city authorized meetings. The Union agrees to take all necessary steps to insure that this time is within reasonable limits.

## ARTICLE XVI

## LEAVE OF ABSENCE

A.   GENERAL LEAVE OF ABSENCE.

1.   Any employees desiring leave without pay for personal reasons shall make a request in writing to the CITY Administrator not less than two (2) weeks in advance of the date for which such leave is desired, except in the event of an emergency, stating the reasons for the leave and the time requested. The maximum amount of unpaid leave shall be six (6) months. An employee shall not be entitled to any Holidays payments for any Holiday that occurs during the leave of absence. Leaves may be granted or denied at the discretion of the Mayor and Council in their absolute discretion.

Employees may not be gainfully employed during the period of such leave. Falsification of the reason for leave or failure to return promptly at the expiration of a leave shall be grounds for discipline, up to and including discharge. Leaves shall be granted or denied in writing.

2.   Employees returning from authorized Leaves of Absence as defined above will, insofar as possible as determined by the CITY, be restored to their original classification ,or equivalent at the then appropriate rate of pay with no loss of seniority or any other employee rights, privileges or benefits. In the event an employee who returns from an authorized leave of absence does not return to his/her original classification, in no event shall his/her rate of pay be less than his/her rate of pay when he/she left on the leave of absence.

B.   MILITARY LEAVE.

1.   Leave shall be granted to employees to fulfill the special military requirements of regular annual active duty (summer camp) for training with any reserve unit of the Army, Navy,



## ARTICLE XVII

### LONGEVITY

1. Employees employed as of the date on which salary increases have been paid under this Agreement shall receive longevity compensation which shall be computed at the rate of two (2) percent of the employee's current pay for every four (4) years of continuous unbroken service with a maximum limit of ten (10) percent at twenty (20) years.

| YEARS OF SERVICE | PERCENT OF ANNUAL SALARY |
|---|---|
| 4 to 8 years | 2 % |
| 8 to 12 years | 4 % |
| 12 to 16 years | 6 % |
| 16 to 20 years | 8 % |
| 20 years | 10 % |

2. All new employees employed after September 18, 2000 shall not receive Longevity compensation.

39



### ARTICLE XVIII

### <u>WAGES</u>

1.     Effective January 1, 2016, all employees employed in the bargaining unit as of December 31, 2015 shall receive an increase of $700 to be added to their base salary.

2.     The annual wages paid are based upon a 2,080 hour work year.

3.     Salaries for new employees who are hired after the signing of this Agreement shall be established by the City and shall be within the minimum and maximum of the Public Works Salary Ranges as set forth in the annual salary ordinance at the City of North Wildwood. The minimum and maximum salaries shall be attached to this Agreement as Exhibit "A" and made a part hereof.

4.     The wage increase for 2016 shall be retroactive to January 1, 2016. In order to be eligible for retroactive pay under this Agreement, the employee must have been employed by the City on December 31, 2015 and must continue to be employed and on payroll at the time of execution of this Agreement.

5.

         Effective January 1, 2017, all employees shall receive an increase of $800 to his or her base salary.


6.     Effective January 1, 2018, all employees under this agreement shall receive an increase of $800 to his or her base salary.

7.     Effective January 1, 2019, all employees under this agreement shall receive an increase of $900.

8.     As of the date of the signing of this Agreement, the parties understand that it is a possibility that legislation may be enacted during the term of this Agreement which could potentially

40



increase minimum wage to be more than some employees under this Agreement are being compensated. In the event that legislation is enacted that <u>requires</u> the City of North Wildwood to increase its rates of compensation so that employees are compensated at a new "minimum wage" the City agrees it will comply with the law, and that if the City is required to increase the rate of pay for any employee(s) to the new minimum wage, then that increase shall be provided but not that year's base wage increase to which that affected employee(s) would otherwise be entitled.

41

## ARTICLE XIX

## UNIFORM ALLOWANCE

The City shall provide an annual allowance of $550.00 for maintenance and replacement of

eligible items listed below:

### Eligible Items:

**Pants**

Navy Work Pants
(Dickies LP856 Industrial Double Knee Pant)

Navy Flannel Lined Work Pants
(Dickies 2874)

Jeans, Dark Stone Color
(Carhartt B17)

Flannel Lined Jeans, Dark Stone Color
(Dickie 29-693)

**Shorts**

Navy Work Shorts
(Dickies LP542 Industrial Cargo)

**Shirts**

Light Blue Hi-Vis Short Sleeve Work Shirt
(Dickies VL100)
Light Blue Hi-Vis Long Sleeve Work Shirt
(Dickies VL101)

**Sweat Shirt**

Insulated Sweatshirt
(Carhartt J149 Navy)
(Carhartt J206 Hi-Vis)

**Jacket**

Carhart Jacket
(When wearing a Carhart Jacket a safety vest supplied by the City must be worn)

**Bib Overall**

Insulated Bib Overall, Duck Brown or Black

42

(Carhart R02 Brown)

**Boots**
Wolverine Steel Toe Work Boot or equivalent
(1123) 6"
(1124) 8"

The list of eligible items may be revised at the discretion of the Department of Public Works Department Head.

The City shall annually designate the City's Supplier of Uniforms and each employee shall be entitled to purchase the eligible items up to the permitted allowance by charging the City's account.

The City will pay for work related damage to employee's eye glasses.

The City shall provide a soft-sided container for personal safety equipment. The list of the equipment will be promulgated by the Department of Public Works Department Head. The employees shall be responsible to maintain the bag on their person at all times during working hours or when called in to work.

Each employee shall wear the Uniform items listed above to work and shall maintain their uniforms in good and clean condition and failure to wear and maintain the uniforms shall be cause for disciplinary action.

The parties agree that the Management Committee will discuss the list of eligible uniform items. Nevertheless, final determination of the eligible uniform items shall be made by the City and the list of eligible uniform items may be revised by the Department of Public Works Department Head.

## ARTICLE XX

## PROMOTIONS AND PROMOTIONAL PAY

Subject to the approval of City Council or their designee, an employee, when he/she is promoted so as to assume additional responsibilities or duties, from one class title to another having a higher salary range, then his/her salary shall be increased to the minimum of the new range or as follows:

For employees earning between $20,000 and $34,999 by ten (10%) percent ;

For employees earning between $35,000 and $49,999 by seven and one half (7.5%) percent;

For employees earning $50,000 or more by five (5) percent of his/her current base salary, which ever is higher.

The City Council or their designee shall determine what is a promotion and whether the employee is entitled to the Promotional Pay provided for above. All job classification determinations shall be done in accordance with the Department of Personnel's rules and regulations. The City Council or their designee shall base the determination upon the increased responsibilities and complexities of the additional duties. Neither an increase in the volume of the same type of work now being performed or length of service in a classification will be considered as a basis for promotion. Furthermore, a change in job classification, per se, is not necessarily a promotion. The determination of the City Council or its designee shall be subject to review.

Any employee who performs work in a higher paid title, which is outside of his or her personnel department description, shall be paid at the starting rate of the higher classification or given five (5%) percent of the employee's base daily wage, whichever is higher. This is for each day worked.

44

As of the signing of this Agreement, during the term of this Agreement, it is the City's . intention to promote individuals within the bargaining unit based upon review and recommendations from the Department Head.

## ARTICLE XXI

## LOYALTY, EFFICIENCY, NO DISCRIMINATION

Employees of the City agree that they will perform loyal and efficient work and service; that they will use their influence and best endeavors to protect the property of the City and its interests; that they will cooperate with the City in promoting and advancing the welfare and prosperity of same at all times.

The provisions of this Agreement shall be applied equally to all employees without discrimination as to age, sex, sexual orientation, gender preference, marital or civil union status, race, color, creed, national origin, political affiliation. Both the City and the Union shall bear the responsibility for complying with this provision of this Agreement.

All references to employees in this Agreement designate both sexes, and wherever the male gender is used, it shall be construed to include male and female employees.

The City agrees not to interfere with the rights of the employees to become members of the Union. There shall be no discrimination, interference, restraint or coercion by the City or any City Representative against any employee activity permissible under the New Jersey Employer-Employee Relations Act of 1986 as amended or this Agreement.

The Union recognizes its responsibility as a Bargaining Agent and agrees to represent all employees in the bargaining unit without discrimination, interference, restraint or coercion.

**ARTICLE XXII**

<u>**DRUG/ALCOHOL-FREE WORKPLACE AND ALCOHOL TESTING**</u>

A drug-free and alcohol free workplace, free from use of non-medically prescribed controlled substances, is vital to the City, to the safety of our work place, to the productivity of our employees, and to the interests of the general public, as is an environment free of employees under the influence of alcohol.

The use, possession, sale or distribution of non-medically prescribed controlled substances or alcoholic beverages on City premises (including parking lots and recreation areas or in any City work environment) is prohibited. "Work environment" includes situations where an employee is representing the City whether on a citizen related call or participating in a business meeting off-premises. A violation of this provision of this drug and alcohol policy is not considered a medical issue and may result in dismissal from the City. This policy also prohibits employees affected by any non-medically prescribed controlled substances or under the influence of alcohol from City premises or other work environments. Consideration is given to the safety of any employee asked to leave our premises due to an impairment (e.g. ability to drive, etc.).

The City reviews employees' off-the-job drug-related or alcohol-related incidents such as arrests for use, possession, sale or distribution of drugs to make a determination if the incident could result in an adverse or potentially adverse impact to the City and/or to our employees. The results of the review will determine the appropriate course of action for the City to take including dismissal, rehabilitation or other actions.

In appropriate circumstances, the City may require employees suspected of being under the influence of drugs and/or alcohol to submit to drug and/or alcohol testing. Drug and/or alcohol testing will only be required and administered in accordance with the provisions of Federal and State

47

*HAVE ! NOT*

law. The City Administrator will consult with the Union Shop Steward prior to the City requiring an employee to submit to drug and/or alcohol testing unless emergency circumstances exist which do not permit adequate time for such consultation. Further, the City shall have the right to require all employees to be subject to random drug testing as required for employees with a Commercial Drivers License (CDL). Employees suspected of being under the influence of alcohol shall be subject to testing under the same standards as are applied to CDL testing of employees, including standards established for determining whether an individual is under the influence of alcohol.

In the event an employee tests positive for use of illegal drugs or for being under the influence of alcohol, that employee will be referred to the City's Employee Assistance Program for counseling and/or treatment, as appropriate. Upon a second positive test result for the use of illegal drugs or being under the influence of alcohol, the employee will be terminated.

48

## ARTICLE XXIII

### SEVERABILITY

In the event that any provision of this Agreement between the parties shall be held by operation of law and/or by a court or administrative agency of competent and final jurisdiction to be invalid or unenforceable, the remainder of the provisions of such Agreement shall not be affected thereby but shall be continued in full force and effect.

Any specific or general provision of this Agreement notwithstanding, wherever a provision of this contract is determined to be in conflict with the Department of Personnel of the State of New Jersey, or with rules, regulations or procedures thereunder, the Department of Personnel's regulations, rules and procedures shall be controlling.

This Agreement shall not be modified in whole or in part by the parties, except by an instrument in writing duly executed by both parties.

49



## ARTICLE XXV

## MISCELLANEOUS

Bulletin Boards:

The City agrees to furnish a bulletin board to be used exclusively by the Association for the posting of notices relating to the Association Meeting and official business only.

The Association agrees to limit its posting of notices and bulletins to such bulletin board.

All bulletins or notices shall be signed by a local association officer or his/her designee.

Extra Contract Agreement:

The City agrees not to enter into any other agreements or contract with bargaining unit members who are covered hereunder, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement.

Lay-offs:

The City may layoff an employee for purposes of efficiency or economy or other valid reasons requiring a deduction in the number of employees in a given class. When a layoff is imminent, the City will notify the association and all applicable Department of Personnel rules will be followed.

Probationary Period:

New employees shall serve a probation period of three (3) months. During this probationary period, they shall be paid as qualified first year employees. For the purpose of seniority and longevity, the original date of hire should be used.

Transfers:

Transfers can be made from one position to another in the same job title in another organizational unit. Transfers will be made with the approval of the Department Head involved and the Mayor or his/her designee.

51

Voting:

The employer agrees to permit any voting for the purpose of ratification of this Agreement, and any successor Agreement hereto during normal working hours at such times as may least interfere with normal work operations.

Outside Employment:

Employees shall be entitled to engage in outside employment during off-duty hours provided that such employment does not conflict with his/her employment responsibilities as an employee of the City of North Wildwood.

Discipline:

All disciplinary action, including suspension, taken against any employee shall be done in accordance with the Department of Personnel's rules and regulations. In cases where the Department Head deems the suspension of an employee to be an immediate necessity for the safety of the public or the welfare of the City, he shall submit a report explaining such action to the governing body and the Union. A copy of said report shall be given immediately to the employee.

Attendance at Court:

If an employee is required to appear in court on City related business, he/she is expected to be dressed in a suitable fashion and said employee shall suffer no loss in pay during the working hours.

## ARTICLE XXVI

## FAIR LABOR STANDARDS ACT

It is acknowledged that commencing on April 15, 1986 the City may be required to comply with the provisions of the Fair Labor Standards Act and the regulations promulgated thereunder as they relate to employees covered by this Agreement. The City reserves the right to take appropriate action to insure such compliance, including but not limited to:

1. The exercising of any election or option available to it under the Fair Labor Standards Act or Regulations;

2. The awarding of compensatory time in lieu of monetary compensation for overtime;

3. Establishing procedures to monitor and control hours worked and overtime;

4. The crediting of any overtime payments made pursuant to this Agreement against any overtime obligation incurred under FLSA;

5. Establishing such rules and regulations as may be necessary to insure compliance with the provisions of FLSA.



# ARTICLE XXVII

## DEFINITIONS

The following words and terms, when used in this Agreement, shall have the following meaning, unless the contents clearly indicate otherwise:

PERMANENT EMPLOYEE:

An employee who has acquired Department of Personnel permanent status in his/her position after the satisfactory completion of a working test period.

PERMANENT STATUS:

The attainment of tenure and rights resulting from the regular appointment and successful completion of the working test period.

WORKING TEST PERIOD OR PROBATIONARY PERIOD:

A part of the testing process which consists of a trial working period after regular appointment during which time the work performance and conduct of the appointee is evaluated to determine if he/she merit permanent status.

PROVISIONAL APPOINTMENT:

Means the appointment to a permanent position pending the regular appointment of an eligible person from a special re-employment, regular re-employment, or employed list.

TEMPORARY APPOINTMENT:

Employment during a period of emergency or in a temporary position.

GRANT EMPLOYEES:

Any person or persons who are employed by the City of North Wildwood to fill positions funded wholly or in part by the State of New Jersey, United States Government, or any other

## ARTICLE XXIX

## MANAGEMENT COMMITTEE

There is hereby established a Management Committee, comprised of two (2) members of the bargaining unit – as shall be the case with any successor negotiations of a bargained union agreement – the Director of Public Works and the City Administrator. The Management Committee shall meet from time to time, on an "as needed" basis, to discuss the application of the terms and conditions of this agreement, including uniforms, as well as the conditions of work and any issues or problems arising there from.

## ARTICLE XXX

## ON CALL

For the Sewer Department only, the Department Head, or his designee, may assign one (1) employee to be "on-call" for a one week (7 days) period and the employee shall carry a pager for the duration of that week. An employee who is assigned to be "on-call" shall receive eleven (11) hours of pay, at the employee's normal hourly rate, for every one week period the employee is required to be "on call". Employees assigned to be "on-call" are expected to be responsible for all calls during the period they are in that assignment and shall respond to a call within thirty (30) minutes of the time in which the call is received. Employees who fail to respond to a call or fail to report within thirty (30) minutes may be subject to discipline. The "on-call" assignment shall be for a period of one week and shall rotate among the employees in the department with the rotation to be determined by the Department Head or his designee. Employees shall have the ability to "swap" on-call weeks with prior approval of the Department Head or his designee.

57

## ARTICLE XXXI

## DURATION OF CONTRACT

This Agreement shall be in full force and effective as of January 1, 2016 and shall remain in effect to and including December 31, 2019 without any re-opening date. This Agreement shall continue in full force and effective from year to year thereafter, unless one party or the other gives notice, in writing, no sooner than one hundred and fifty (150) days, or no later than ninety (90) days prior to the expiration date of this agreement of a desire to change, modify or terminate this Agreement.

IN WITNESS WHEREOF, the parties hereto have hereunto caused these present to be properly signed and the proper seals to be affixed hereto in the City of North Wildwood, New Jersey, on this 2nd day of August , 2016.

UNITED PUBLIC SERVICE                     THE CITY OF NORTH WILDWOOD
EMPLOYEES UNION:                          NEW JERSEY

_____             _____
Kevin E. Boyle Sr.                        Mayor Patrick Rosenello
President, UPSEU
                                          _____
                                          Kevin Yecco, City Administrator

R Holliday    Rose Holliday
R Grace     R Shun                        _____
                                          W. Scott Jett, City Clerk

G:\CLIENTS\NORTHWW\United Public Service Emp. Union\2015 Negotiations\UPSEU FINAL AGREE. 2016 to 2019 FINAL.doc

58

## EXHIBIT "A" - PUBLIC WORKS SALARY RANGES

| TITLE | MINIMUM STARTING SALARY | MAXIMUM SALARY |
|---|---|---|
| CARPENTER (1ST YEAR) | $25,000 | 50,000 |
| CARPENTER (AFTER 1ST YEAR) | 27,500 | 50,000 |
| ELECTRICIAN (1ST YEAR) | 28,000 | 50,000 |
| ELECTRICIAN (AFTER 1ST YEAR) | 30,000 | 50,000 |
| EQUIPMENT OPERATOR | 28,000 | 60,000 |
| HEAVY EQUIPMENT OPERATOR | 32,000 | 70,000 |
| LABORER | 21,250 | 45,000 |
| MAINTENANCE REPAIRER | 23,000 | 46,000 |
| MECHANIC (1ST YEAR) | 27,500 | 45,000 |
| MECHANIC (AFTER 1ST YEAR) | 30,000 | 45,000 |
| MECHANIC HELPER | 23,000 | 35,000 |
| PUBLIC WORKS REPAIRER | 23,000 | 46,000 |
| SR. CARPENTER | 32,000 | 62,000 |
| SR. ELECTRICIAN | 35,000 | 62,000 |
| SR. MECHANIC | 32,000 | 60,000 |
| SR. PUBLIC WORKS REPAIRER | 25,000 | 60,000 |
| SEWER REPAIRER | 25,000 | 60,000 |
| SR. SEWER REPAIRER | 32,000 | 65,000 |
| SR. TRAFFIC MAINTENANCE WORKER/ELECTRICIAN | 32,000 | 62,000 |
| TRAFFIC MAINTENANCE WORKER | 23,000 | 50,000 |
| TRAFFIC MAINTENANCE WORKER/ELECTRICIAN | 27,500 | 65,000 |

